IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 06-268 |
| | : | |
| LEE N. BLATT | : | |
| HERLEY INDUSTRIES | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                          November 5, 2007

Lee Blatt and Herley Industries, Inc., are charged with violations of five criminal statutes[1] in the course of a complex scheme to defraud the government on three different contracts.  The indictment[2] alleges that in each of the contracts Herley Industries, at Blatt's direction, submitted fraudulent bid price quotations and used fictitious documents to support these prices, deriving a profit of up to 300% on the contracts.  (Indictment ¶¶ 26-27.)  The defendants filed a motion to dismiss the indictment, contending that the indictment attempts to criminalize an act that is not a crime: "failing to base quotations on historical costs."  The defendants claim that as a result of this "misunderstanding" of federal procurement law, the government misinformed the grand jury concerning the

---

[1]The indictment charges violations of:
    (1) 18 U.S.C. § 1343 (wire fraud; 27 counts);
    (2) 18 U.S.C. § 1516 (obstruction of a federal audit; 2 counts);
    (3) 18 U.S.C. § 1001 (false statement to the government; 3 counts);
    (4) 18 U.S.C. § 1031 (major fraud against the United States; 1 count); and
    (5) 18 U.S.C. § 2 (aiding, abetting and causing).

[2]The Government filed its original indictment on June 6, 2006.  On January 30, 2007, the Government filed a 33-count, superceding indictment that made no substantive changes to the allegations, but added four wire transfers not included in the original indictment.  All references to the "indictment" refer to the superceding indictment, unless otherwise noted.

legality of the defendants' price quotes, resulting in a "tainted" indictment and justifying the harsh remedy of dismissal. For the following reasons, I will deny the defendants' motion to dismiss the indictment.

**I.    BACKGROUND**

The facts relevant to this discussion are viewed in the light most favorable to the government as the non-moving party.[3]

Defendant Herley Industries is a publicly owned, microwave technology company with its headquarters in Lancaster, Pennsylvania and a division in Farmingdale, New York. Herley Industries designs and manufactures sophisticated components for the defense and aerospace industries. Defendant Lee Blatt was a founder and Chairman of the Board of Herley Industries; he also served as its Chief Executive Officer for a period ending in 2001.

Between 2000 and 2002, defendant Herley Industries entered into three military contracts to supply electronic components for aircraft radar systems: two contracts with the U.S. Air Force, one contract with the U.S. Navy. Specifically, Herley Industries agreed to supply voltage controlled oscillators ("VCOs"), used by the Air Force in F-16 fighter jet radar systems, and power heads, used by the Navy in E2-C planes (also known as "Hawkeye" planes). Herley Industries was the only company that manufactured VCOs

---

[3]In deciding a motion to dismiss under Federal Rule of Criminal Procedure 12(b)(3), I must accept as true the facts alleged in the indictment. United States v. Panarella, 277 F.3d 678, 681 (3d Cir. 2002).

and power heads, and therefore the military solicited bids on these components directly from Herley Industries as a "sole source" provider.

Under the unique contracting process for sole source products, the military relied exclusively on the pricing information provided by Herley Industries to assess the fairness of the bids. (Indictment ¶¶ 14-17.)[4] The contracting process required defendant Herley Industries, as the bidder, to submit a cost breakdown and pricing information, including information about Herley's prior experience, called "historical data." In the negotiation process, the military also required Herley Industries to submit a completed Standard Form 1411 ("SF 1411"), certifying that the proposed price "reflects . . . estimates and/or actual costs." (Indictment ¶ 13.) In sole source contracts valued at over $500,000, such as the contracts involved in this case, the government procurement officer was authorized to and did request a "pre-award audit" of Herley Industries' quotations. In conducting the pre-award audit, government auditors examined the cost breakdown and pricing information submitted by Herley Industries to ensure that the bid price was "reasonable and justified on the basis of past experience (historical data)." (Indictment ¶ 16.) After the pre-award audit and some final negotiations, the Air Force, the Navy and Herley Industries

---

[4]The indictment's allegedly faulty description of the bidder's legal obligations in negotiating a sole source contract forms the crux of defendants' argument in this motion to dismiss. According to the indictment, "federal regulations required" the cost breakdown submitted with any bid to be based on "current, good faith reasonable estimates, that is, based on the company's prior experience" or so-called "historical data." (Indictment ¶ 14.) The defendants argue that no such requirement exists, that Blatt and Herley were entitled to quote any price for the components, and that the indictment "equates the submission of a price not based on historical costs, i.e., too far above those costs, as fraud." (Def.'s Br. 4.) These arguments will be addressed below.

eventually reached agreement on each of the three contracts. Upon confirming the finalized terms, Herley Industries signed a Certificate of Current Cost and Pricing Data, certifying that "pricing data . . . are accurate, complete and current." (Indictment ¶ 20.)

The indictment alleges an identical scheme to defraud for each contract. (Indictment ¶¶ 22-29.) Blatt would dictate the amount of the fraudulent quote, as well as the fiction that would support it, namely that due to obsolescence a new manufacturing process would raise the cost of the component in question. In each case, Blatt allegedly invented a price for a new part that would need to be purchased intra-company in order to manufacture the VCOs and power heads required by the military. Blatt would then direct the division of Herley Industries issuing the fictitious quotation to support both the quotation and the story used to justify it. Blatt simultaneously directed Herley Industries to produce the VCOs and power heads as it always had, so that the cost to Herley Industries was far lower than the estimates submitted to the military during contract negotiations. Then, after the government had agreed to the contract in each case, the indictment alleges that Blatt created a false paper trail to show that an unexpected, intervening event allowed Herley Industries to take advantage of the older, far less expensive production method. Because the contracts were all "firm fixed-price contracts," the price term could not be altered even in the face of changed circumstances generating windfalls or unanticipated costs. Therefore, the alleged fraudulent scheme allowed the defendants to reap a windfall of approximately 250% of its costs on power

heads, and approximately 300% on VCOs as a result of the fictitious change in production methods.

The defendants filed the present motion to dismiss the indictment, contending: (1) that the government's charges are based on the erroneous legal theory that price quotations must be based on historical data; (2) that the instructions given to the grand jury by the government were therefore incorrect; and (3) that these errors tainted the entire process, requiring dismissal of the indictment. The government argues that the asserted erroneous legal theory is unrelated to the actual charges in the indictment, and that, alternatively, the cited error of law would not justify dismissal of the indictment.

## II.   LEGAL STANDARD

An indictment must allege sufficient facts to establish the legal requirements of the crimes charged. See United States v. Cefaratti, 221 F.3d 502, 507 (3d Cir. 2000). "In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." United States v. Hedaithy, 392 F.3d 580, 589 (3d Cir. 2004) (citing United States v. Zauber, 857 F.2d 137, 144 (3d Cir. 1988)). Dismissal of an indictment is an "extreme remedy," reserved only for the most egregious abuses of the criminal process. United States v. Fisher, 692 F. Supp. 495, 501 (E.D. Pa. 1988) (quoting United States v. Birdman, 602 F.2d 547, 559 (3d Cir. 1979)). See also United States v. Martino, 825 F.2d 754, 759 (3d Cir. 1987) (noting that the Third Circuit had not once ordered dismissal of

an indictment based on prosecutorial misconduct before the grand jury).

In Bank of Nova Scotia v. United States, 487 U.S. 250, 255-56 (1988), the Supreme Court established the standard for dismissing an indictment based on error in a grand jury proceeding. The Court held that the district court must employ the "customary harmless-error inquiry" when deciding a motion to dismiss an indictment prior to the conclusion of trial. Id. at 256. "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." Id. (citing United States v. Mechanik, 475 U.S. 66, 78 (1986)) (internal quotations omitted). Thus the Court contemplated a two-step inquiry: first, the nature of the error at issue must be determined; second, assuming a prosecutorial error has occurred, the district court must consider whether that error prejudiced the defendant under the "substantial influence" standard articulated in Bank of Nova Scotia.[5] See id.

According to Blatt and Herley, the government does not understand federal procurement law. The defendants argue that this "erroneous interpretation" threaded its way through the grand jury proceedings and into the language of the indictment. The first step is to determine whether the government's conduct constitutes an error with respect to

---

[5]The Court in Bank of Nova Scotia does carve out a "narrow category" of cases where a showing of prejudice is not required. Bank of Nova Scotia, 487 U.S. at 256-57 (including in this category cases of racial discrimination in selection of grand jurors). However, the defendants do not suggest, and I do not find, that the error of law at issue here rises to the level of "fundamental unfairness" required by the Court under Bank of Nova Scotia.

its legal interpretation of the statutes allegedly violated, and whether its instructions to the grand jury concerning those charges, or the indictment itself, are flawed. The prejudice discussion follows this analysis of purported error.

### III.   DISCUSSION

   A.   The Indictment Does Not Misstate the Law with Respect to Any of the Five Crimes Charged

The indictment charges the defendants with wire fraud, major fraud, obstruction, false statements and aiding and abetting. In their briefs, the defendants argue that a misstatement of federal procurement law is expressly incorporated into each charge, rendering the indictment invalid on its face as to each of its 33 counts. (Def. Reply Br. at 9.) That "misstatement" is principally contained in ¶ 14 of the indictment, which states:

> Federal regulations required that the analysis and information submitted [to the military] in support of a proposal by a bidder such as defendant HERLEY INDUSTRIES were to be current, good faith reasonable estimates, that is, based on the company's prior experience, modified, if necessary, by any changed circumstances or reasonably believed likely changed circumstance. The contractor's prior experience was called "historical data."

(Indictment ¶ 14.)[6] According to the defendants, these portions of the indictment

---

[6] The defendants also cite the indictment's reference to a "fraudulent quote" in ¶ 22; as well as the language contained in ¶¶ 34 and 57, which alleges that Blatt knew that prices quoted for VCOs and power heads, respectively, were not based on historical costs and did not reflect true estimates. (Def. Br. at 12-13.) Similarly, defendants dispute the indictment's references to the pre-award audit process as "permeated" with misstatements, citing ¶¶ 15, 16, 28, 36-42, 44, 55, 57-61, and 68-75 of the indictment. (Id. at 5.) While these paragraphs certainly contain bald allegations of fraud, the facts of which must be proven at trial, they also allege acts by the defendants that would, if true, constitute fraud. Nothing in the cited paragraphs suggests that the quotes are fraudulent *because* they are not based on the cost data submitted. The indictment

erroneously suggest that the quotations at issue were fraudulent "merely because they were not based on historical, or actual, costs of the products." (Def. Br. at 13.) On the contrary, the defendants claim, the applicable "federal regulation," the Truth in Negotiations Act, 10 U.S.C. § 236a ("TINA"), "is strictly a disclosure statute," irrelevant to the actual calculation of bid quotations. (Def. Br. at 17) (citing Karen L. Manos, 2 GOVERNMENT CONTRACT COSTS & PRICING 84:A Introduction (2004)). Therefore, according to the defendants, the government based its fraud claims on a fundamentally flawed, and legally inaccurate, premise–that the prices were fraudulent as quoted because they were not *based on* the information disclosed in compliance with TINA. A common sense reading of the indictment suggests otherwise.

The indictment contemplates a "wide-ranging scheme to defraud the government . . . ab initio." (Gov't Br. at 9.) The defendants' arguments on this motion to dismiss tend to eschew the fact that the estimates in question form part of a larger scheme alleged in the relevant fraud charges of the indictment.[7] The indictment's description of the quotes as "fraudulent" in ¶ 22, for instance, most logically refers to the overall scheme to defraud, rather than to the link or lack thereof between the quotes and the historical data supplied by Herley Industries under TINA's provisions. As the government argues, the

---

clearly indicates, in ¶ 57, for example, that the cost data submitted were not "true costs and expenses" to begin with.

[7]As noted above, only three of the five criminal statutes charged are fraud-related. The defendants assert that the government's error "tainted" the entire indictment, justifying dismissal of all the charges. This argument will be addressed below, in section III(C).

very cost data that the defendants attempt to distinguish as mere "disclosure" under TINA are alleged to be "suffused with on-going fraudulent misrepresentations on labor and materials costs." (Gov't Br. at 12-13, 15), see also Cibinic, Jr. & R.C. Nash, Jr., FORMATION OF GOVERNMENT CONTRACTS 193 (3d ed. 1998) ("Cibinic Treatise") ("There are two types of defective pricing situations that are often treated as instances of fraud–the falsification of cost or pricing data and the submission of bad estimates.").

Moreover, the indictment does not misstate the law with respect to any of the criminal statutes actually charged in this case, or the role of disclosure requirements under TINA.[8]  In fact, the parties do not appear to dispute that the indictment properly "alleges sufficient facts to establish the legal requirements of the *crimes charged*."  Cefaratti, 221 F.3d at 507 (emphasis added).  The federal wire fraud statute reads in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall [be guilty of a crime].

18 U.S.C. § 1343.  See also United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001) (setting out the elements required to prove wire fraud).  In this case, the indictment clearly alleges a scheme on the part of Blatt and Herley to cause the military to pay inflated

---

[8]Indeed, much of the authority cited by the defendants to support their position is distinguishable from the present case in light of the fact that the misinstruction at issue in those cases related to the charged, criminal statutes involved.  (See Gov't Br. at 8-9.)  It is debatable whether the inquiry on a motion to dismiss an indictment requires an examination that searches for misinstruction on the relationship between the acts alleged and other federal statutes.

prices for the subject VCOs and power heads, so that the defendants could reap windfall profits at the military's expense.  The indictment further alleges that the military was induced to pay these inflated prices by the fictitious description of higher manufacturing costs, designed by Blatt and supported by false representations that he directed Herley to render.  The deliberate, false inducement allegedly undertaken by Blatt and Herley in order to obtain more money from the military forms the basis of the government's fraud charges in the indictment.  These allegations, and the facts used to support them, are consistent with the requirements of the federal wire fraud statute.

The error of law at issue, however, relates purely to federal procurement law governing sole source contracts.  It is plain that, if it may be shown that the defendants compiled and disclosed false, inflated cost data as part of an overall scheme to defraud that included the submission of "bad estimates," TINA would not save them from allegations of fraud.  See Cibinic Treatise at 193,195.  Furthermore, TINA would leave sole source contracts "open to abuse" if its provisions were construed to allow the bidder to name any price, i.e. even a "fraudulently compiled" price.  (Gov't Br. at 12), see United States v. Singer Co., 889 F.2d 1327, 1329 n.8 (4th Cir. 1998), see also Appeals of United Technologies Corp., ASBCA No. 51410, 2004 ASBCA Lexis 15, at *63-64 (Feb. 27, 2004) ("[TINA] requires a contractor . . . to certify that the data are accurate, current and complete").  On the contrary, the disputed language in the indictment properly reflects the fact that, even though quoted prices need not be based on historical data under TINA, the

prices themselves, like the historical data, can be fraudulent.

In short, the proper inquiry on a motion to dismiss focuses on the sufficiency of the alleged facts to establish the elements of the crimes charged in the indictment.  TINA, a statute governing federal procurement law, appears nowhere in the indictment, making the relationship between its provisions and the task at hand tenuous at best.  The defendants' attempt to insert a legal error between the lines of the indictment must not derail the proper focus of analysis on a motion to dismiss.  Furthermore, in this case, the indictment both sufficiently sets forth the fraud charges that form its subject, and adequately represents the defendants' obligations under TINA.

      B.     The Government's Instructions to the Grand Jury Did Not Misstate the Law

The defendants further allege that prosecutorial error occurred in instructing the grand jury with respect to the relevant law.  (See Def. Br. at 5-8.)  In other words, the government's same "erroneous interpretation" of federal contracting law operated to confuse the grand jury regarding the legality of the bids submitted by Herley Industries.  As the defendants note, prosecutorial misconduct before the grand jury is a recognized ground for dismissal of an indictment.  See, e.g., Bank of Nova Scotia, 487 U.S. at 256-57, Martino, 825 F.2d at 758-59, United States v. Peralta, 763 F. Supp. 14, 22 (S.D.N.Y. 1991).

In particular, the defendants object to the grand jury testimony of Special Agent Ninh Jang of the Defense Criminal Investigative Division of the Department of Defense.

(See Def. Br. at 5-8.)  Agent Jang testified on several occasions, introducing much of the government's evidence to the grand jury.  Contrary to the allegations of the defendants on this motion to dismiss, the disputed portions of Agent Jang's testimony either correctly state the defendants' obligations under government procurement law, or simply express the witness' own opinion based on relevant personal experience.[9]  Indeed the defendants' only colorable claim in this regard relates to the language of the previous indictment, which was read into the record during the case agent's testimony.  (Id. at 6.)  Paragraph 14 of what is referred to in Agent Jang's testimony as a "draft indictment" contains language more suggestive of the fact that the defendants had an obligation under TINA to base prices on "historical data"  (See Def. Ex. D at 14 (describing the document read into the record as a "draft"), 26 (reciting ¶ 14 of that document).)  That paragraph reads, in relevant part,

> Federal regulations required that the quotation and the analyses submitted by a bidder such as defendant Herley Industries were to be based on the company's prior experience, modified, if necessary, by any changed circumstance.

(Id. at 26.)  Paragraph 14 of the superceding indictment adjusts this language slightly, stating that price quotes were to be "good faith reasonable estimates, that is, based on the company's prior experience, modified, if necessary, by any changed circumstances."

---

[9]For example, Agent Jang stated that the contractor's bid is "generally based on historical figures" and that Herley's prices were "inflated."  (See Def. Br. at 5-6).  It is difficult to see how these averments misstate the defendants' legal obligations; the case agent was testifying to his general knowledge of the contracting process and his own opinion concerning the bids in question.

12

(Indictment at ¶ 14.)  In neither paragraph, however, does the language suggest that the fraud-related charges lodged in the indictment stem from a breach of this purported obligation under contract law.  Moreover, the grand jury heard from numerous other witnesses on all aspects of the fraudulent scheme alleged in the indictment, including the process of preparing and submitting the various price quotations.  (Gov't Br. at 14.)

Finally, it must be noted that the authority relied upon by the defendants universally addresses errors of instruction on either the criminal statutes charged, or requirements that formed the central basis for those charges, rather than ancillary obligations such as the defendants' disclosure requirements under TINA.  (See Def. Br. at 14-16.)  For example, the defendants cite United States v. Peralta, 763 F. Supp. 14, 21 (S.D.N.Y. 1991), for the proposition that dismissal of an indictment is proper where the government's error goes to "the requirements of the legal theory at the core of the government's case."  (See Def. Br. at 16.)  In Peralta, however, the government failed to instruct the grand jury on the difference between the legal concepts of actual and constructive possession.  763 F. Supp. at 16.  The court dismissed the indictment in that case because the government itself acknowledged that the "somewhat counterintuitive" concept of constructive possession "had been the lynchpin to its entire case against both defendants."  Id.; see also U.S. v. D'Alessio, 822 F. Supp. 1134, 1143-44 (D.N.J. 1993) (dismissing an indictment for mail fraud where the application of a state ethics rule to the defendants was ambiguous, and to redact references to the rule in the indictment would

13

"alter the substance of the charged offense").

In this case, unlike Peralta and D'Alessio (upon which the defendants rely heavily), TINA's disclosure requirements are irrelevant for the purpose of proving the government's fraud theory, though the requirements do provide a backdrop for the fraudulent scheme alleged in the indictment.  See Peralta, 763 F. Supp. at 16; D'Alessio, 822 F. Supp. at 1144.  The grand jury in the instant case was therefore never instructed that the fraud charges against Blatt and Herley somehow depended on proof of an underlying TINA violation, which was the fatal flaw in the indictment in D'Alessio.  See id. at 1138 (accepting gifts in violation of the relevant ethics rule was the "central basis" for the government's mail fraud charges).  Indeed, removing all references to TINA would not "alter the substance of the charged offense" in the slightest, as TINA's disclosure requirements play the very limited role of helping to shape the mode in which Blatt and Herley undertook the alleged scheme to defraud; the "central basis" for the government's allegations lies in the scheme itself.  See id. at 1138.

It is clear that no misconduct before the grand jury has occurred in this case.

### C. The Alleged Error Would Not Justify Dismissal of the Indictment

The defendants attempt to depict the violation in this case as a chain reaction, beginning with misinstruction to the grand jury, and progressing inexorably toward tainted indictment–the result being prejudice that rises above the "harmless error" threshold prescribed by the Supreme Court in Bank of Nova Scotia.  See Bank of Nova

Scotia, 487 U.S. at 255. Dismissal of an indictment is an "extreme remedy." Fisher, 692 F. Supp. at 501. The defendants must show that the alleged violation "substantially influenced the grand jury's decision to indict," or that there is "grave doubt" that the decision was rendered free of substantial influence of the violation. Bank of Nova Scotia, 487 U.S. at 256. Thus, even assuming the government employed an erroneous reading of federal procurement law, or engaged prosecutorial misconduct before the grand jury, the defendants would have to show that the error impacted the indictment in its entirety. Id. I have already concluded that no error or misinstruction has occurred in this case, obviating the need to apply the drastic remedy of dismissing the indictment.

Indeed, the balance of authority weighs against levying the remedy of dismissal even had the defendants made out a stronger case of a violation. Especially compelling is the Third Circuit's description in Martino of the rarity with which the remedy has been employed:

> In fact, in none of the Third Circuit cases in which we found prosecutorial misconduct before the grand jury did we order dismissal of the indictments. Instead, we looked to whether there was sufficient evidence to support the indictment. In almost all of the cases, we determined that the misconduct was harmless error and not prejudicial. Even in United States v. Serubo, where we stated that "dismissal of an indictment [pursuant to the court's supervisory power] may be virtually the only effective way to encourage compliance [by prosecutors with] ethical standards, and to protect defendants from abuse of the grand jury process," 604 F.2d [807, 817 (3d Cir. 1979)], we did not automatically dismiss the indictment for the "extreme" misconduct we found there. Instead, we remanded to the district court to determine whether the misconduct infected the second of the two grand juries that participated in the investigation. Id. at 818-19.

United States v. Martino, 825 F.2d at 759-60 (citation omitted).  Likewise, in Fisher, the court determined that "dismissal will not be appropriate . . . when there is no evidence of a deliberate attempt by the witness and the prosecutor to mislead."  692 F. Supp. at 501 (citing United States v. Cathey, 591 F.2d 268, 272 (5th Cir. 1979)).  Moreover, in each of these cases, the prosecutorial error involved was far more flagrant than that alleged by the defendants in the instant case.  See Martino, 825 F.2d at 756 (no dismissal where the prosecutor caused the grand jury to issue a subpoena to an undercover agent's pseudonym, concurrent with subpoenas for the defendants); Serubo, 604 F.2d at 818 (no dismissal where prosecutor made "graphic and misleading references associating the defendants with organized crime"); Fisher, 692 F. Supp. at 503 (no dismissal where the government referenced bribery of state and federal officials and mail fraud in its presentation to the grand jury, where such offenses were not charged).

     In this case, the defendants fail to show that the government incorrectly stated the law with respect to sole source contracts, nor do they establish that any prosecutorial misconduct took place during the grand jury proceedings.  Certainly, there has not been a showing of any "deliberate attempt to mislead" on the part of the prosecution.  Fisher, 692 F. Supp. at 501.  Furthermore, the alleged error goes only to the indictment's fraud-related claims, and would not in any case create a "grave doubt" that the grand jury's decision to indict was substantially influenced by such an error.  Bank of Nova Scotia, 487 U.S. at 256.

**IV.    CONCLUSION**

For the reasons listed above, the indictment properly states violations of 18 U.S.C. §§ 1343, 1516, 1031, 1001, and 2.  Accordingly, I will deny the defendants' motion to dismiss.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES** | : | **CRIMINAL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 06-268** |
| | : | |
| **LEE N. BLATT** | : | |
| **HERLEY INDUSTRIES** | : | |

**O R D E R**

**STENGEL, J.**

**AND NOW**, this          day of November, 2007, upon consideration of defendants' motion to dismiss the indictment (Document #24), it is hereby **ORDERED** that the motion is **DENIED**.

BY THE COURT:


  /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.